# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF NEW MEXICO

LOUISE GILBERTSON,

       Plaintiff,

vs.                                                                  No. CIV 99-1065 LH/LFG

ALLIED SIGNAL, INC. and LIFE INSURANCE OF
NORTH AMERICA,

       Defendants.


## MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on Plaintiff's Motion for Summary Judgment

(Docket No. 75). The Court, having conducted a *de novo* review of Plaintiff's claim of eligibility for

long-term disability benefits, pursuant to the Employee Retirement Income Security Act (ERISA),

finds that her Motion for Summary Judgment is not well taken and will be **denied** and that

Defendants' administrative decision regarding her claim, which by operation of law is deemed as

denying benefits,[1] will be **affirmed**.

---

[1] ERISA regulations relating to "Review procedure" in effect at the time relevant to this case provide in part
that

> A plan may establish a limited period within which a claimant must file any request for review of
> a denied claim. Such time limits must be reasonable and related to the nature of the benefit which is
> the subject of the claim and to other attendant circumstances. In no event may such a period expire less
> than 60 days after receipt by the claimant of written notification of denial of a claim.

Administration and Enforcement Under the Employee Retirement Income Security Act of 1974, 29 C.F.R. § 2560.503-
1(g)(3) (1999) (Amendments to 29 C.F.R. § 2560 in 2000 apply only to claims filed on or after January 1, 2002. *See,
e.g., Gilbertson v. Allied Signal, Inc.*, 328 F.3d 625, 629 n.3 (10th Cir. 2003).). The regulations further direct as to
"Decision on review" that

> (1)(i)  A decision by an appropriate named fiduciary shall be made promptly, and shall not ordinarily
> be made later than 60 days after the plan's receipt of a request for review, unless special circumstances

## Background

Plaintiff was employed by Defendant AlliedSignal, Inc. ("AlliedSignal") as an Administrative Support Coordinator.  (App. Rec. at 243.)[2]  While her symptoms apparently began in January 1997 (*id.* at 211, 253), Plaintiff first consulted her family physician, Gwenn S. Robinson, M.D., about them on March 12, 1998 (*id.* at 253, 266).  A week or so later, Dr. Robinson diagnosed Plaintiff with fibromyalgia.[3]  (*Id.* at 239.)  Plaintiff took short-term disability leave on April 20, 1998 (*see id.* at 213), which lasted through September 30, 1998, when AlliedSignal terminated her employment, *Gilbertson v. Allied Signal, Inc.*, 328 F.3d 625, 628 (2003).  Plaintiff filed an Application for Long-Term Disability ("LTD") benefits on October 6, 1998.  (App. Rec. at 224).

On December 8, 1998, a senior case manager and a medical consultant of Defendant Life Insurance Company of North America (LINA), the third-party administrator of AlliedSignal's *Salaried Employees Pension Plan of AlliedSignal, Inc. for AlliedSignal Aerospace Employees at*

---

(such as the need to hold a hearing, if the plan procedure provides for a hearing) require an extension of time for processing, in which case decision shall be rendered as soon as possible, but not later than 120 days after receipt of a request for review.
. . . .
(4)  The decision on review shall be furnished to the claimant within the appropriate time described in paragraph (h)(1) of this section. *If the decision on review is not furnished within such time, the claim shall be deemed denied on review.*

*Id.* at § 2560.503-1(h) (emphasis added).

Defendants concede their failure to render a decision on Plaintiff's initial appeal and do not contest that the claim must be "deemed denied" pursuant to ERISA regulations.  *Gilbertson*, 328 F.3d at 631.

[2]  The parties move the Court for permission to file the "Appeals Record" ("App. Rec.") in order to standardize referrals to the record and avoid both duplication of exhibits and the submission of voluminous attachments.  (*See* Stipulated Motion to File Appeal's Record as One Exhibit (Docket No. 76)).  The Court grants this Motion by separate order.  All citations herein to documents contained in that record use the numbers located on the upper right-hand corner of the page.

[3]  "A group of common nonarticular disorders characterized by achy pain, tenderness and stiffness of muscles, areas of tendon insertions and adjacent soft-tissue structures."  *Gilbertson*, 328 F.3d at 627 n.1 (quoting *The Merck Manual* 481 (17th ed. 1999)).

*the Kansas City Division (Amended and Restated as of January 1, 1993)* ("the Plan"), reviewed Plaintiff's file and the supporting medical documentation. (*See id.* at 271.) These materials included Plaintiff's Application for LTD (*id.* at 224-38), Dr. Robinson's letter of August 14, 1998 (*id.* at 239), Plaintiff's Medical Release for LTD completed by Dr. Robinson on October 7, 1998 (*id.* at 211), Immediate Supervisor's Work Statement (*id.* at 243), Dr. Robinson's questionnaire, completed November 2, 1998 (*id.* at 252-53),  Plaintiff's chiropractor Dr. Jeffrey L. Bender's letter of July 7, 1998, and his treatment records (*id.* at 259-62), and Dr. Robinson's records (*id.* at 263-69). By letter dated December 9, 1998, LINA informed Plaintiff that it was denying her LTD benefits on grounds that she had failed to provide adequate objective medical evidence demonstrating that she was disabled according to the Plan's definition.  (*Id.* at 275-77.)

Neill Gilbertson, Plaintiff's husband, appealed LINA's decision on her behalf on January 4, 1999 (*id.* at 278-79),[4] and LINA acknowledged Plaintiff's request for review by letter dated January 28, 1999 (*id.* at 282).  By fax dated February 16, 1999, LINA granted Plaintiff's request for more time to gather and submit additional medical evidence in support of her appeal, extending the deadline to March 31, 1999.  (*Id.* at 285.)  Inexplicably, this was the last communication from LINA to Plaintiff.  *See Gilbertson*, 328 F.3d at 629.

Plaintiff submitted additional materials on March 25, 1999, through her attorney (*id.* at 296-305), who had notified Defendants of his representation by letter dated February 25, 1999 (*id.* at 295).  These materials included a medical report by Dr. Bender dated February 25, 1999 (*id.* at 299-300); and statements by Plaintiff's husband (*id.* at 301-02), her friend Kathleen DeHoff (*id.* at 303),

---

[4] *See also* App. Rec. at 280 (Power of Attorney dated January 4, 1999, by Plaintiff appointing her husband to act for her regarding her disability claim).

and her former supervisor and friend Jerry Green (*id.* at 304-05), made in connection with Plaintiff's claim for Social Security Disability benefits, dated respectively February 6, 10, and 22, 1999.  By letter dated April 7, 1999 (*id.* at 306), Plaintiff's attorney submitted additional materials: Dr. Robinson's letter of March 29, 1999 (*id.* at 307-08), and her records for Plaintiff's appointments on December 18, 1998, January 6, 1999, and March 5, 1999 (*id.* at 309-10).

LINA reviewed the Appeal on May 7, 1999.  (*Id.* at 311.)  Finding that Plaintiff's symptoms were self-reported, with no testing on file supporting her subjective complaints, "typically the nature of the dx of fibromyalgia," (*id.* at 312), the case manager referred the file to its medical consultant for review and referral to a physician.  (*Id.* at 311-13.)  Thomas Franz, M.D., reviewed Plaintiff's file and completed his Physician Case Review on May 25, 1999.  (*Id.* at 316-17.)

By certified letter dated June 1, 1999, date stamped by the Group Life & Disability Benefits Office on June 15, 1999, Plaintiff's attorney inquired whether the case was going to be accepted or rejected and again submitted Dr. Robinson's notes for Plaintiff's December 18, 1998, January 6, 1999, and March 5, 1999, visits.  (*Id.* at 318-20.)  LINA held a staffing session on June 10, 1999, during which it was agreed that Plaintiff should be scheduled for an ARCON IME/FCE (independent medical examination and functional ability testing).  (*Id.* at 321.)  The medical consultant was informed of this decision by a Memo dated June 15, 1999, which also stated that Plaintiff's attorney should be notified of the details of the appointment and Plaintiff copied.  (*Id.*)  After copying and preparation of Plaintiff's file (*id.* at 324), the referral was made to HealthSouth on June 29, 1999 (*id.* at 322-23).  Following numerous calls by LINA regarding the status of its referral (*see id.* at 324, 331), HealthSouth notified Plaintiff by certified letter dated August 17, 1999, that she was scheduled for an appointment on September 9, 1999 (*id.* at 326).  Plaintiff filed this suit on August 25, 1999.

(*See* Notice of Removal, Ex. A. Complaint to Recover Damages (Docket No. 1).)  On September 7,

Mr. Gilbertson canceled Plaintiff's September 9 appointment.  (App. Rec. at 332.)  Plaintiff did not

respond to subsequent communication from HealthSouth regarding other appointment settings.  (*See*

*id.* at 327, 329, 330, 333.)  Her attorney informed HealthSouth sometime around the last week of

November 1999 that no further attempts to contact Plaintiff  should be made.  (*Id.* at 334.)

    Applying the deferential arbitrary and capricious standard of review, this Court found LINA's

"deemed denied" decision supported by substantial evidence in the record and granted summary

judgment to Defendants.  On appeal, however, the Tenth Circuit Court of Appeals held, as an issue

of first impression in this circuit, that when substantial violations of ERISA deadlines result in a claim

being automatically deemed denied on review, as it determined was the case here,[5] the district court

must review the denial *de novo*, even if the plan administrator has discretionary authority to decide

claims.  *Gilbertson*, 328 F.3d at 631.  Thus, this Court must "conduct a  *de novo* review of Mrs.

_____

[5]  The appellate court found that

an administrator who fails to render a timely decision can only be in substantial compliance with
ERISA's procedural requirements if there is an ongoing productive evidence-gathering process in which
the claimant is kept reasonably well-informed as to the status of the claim and the kinds of information
that will satisfy the administrator.
        No such meaningful dialogue took place in Mrs. Gilbertson's case. . . .
        . . .
        Finally, after more than six months of radio silence from LINA, Mrs. Gilbertson received a
notice of a scheduled appointment from LINA's outside doctors. . . . LINA had ceased participating in
a meaningful dialogue with Mrs. Gilbertson more than six months previously, and it never got around
to exercising its discretion or applying its administrative expertise to reach a final decision. This cannot
be construed as substantial compliance with ERISA's procedural requirements.

*Gilbertson*, 328 F.3d at 636 (internal citation omitted).

Gilbertson's claim of eligibility for LTD benefits under the Plan, based on the record before LINA at the time she filed suit."[6]  *Id.* at 637.

## ANALYSIS

### Standard of Review

Plaintiff moves for summary judgment in her favor and payment of LTD benefits on grounds that there is no genuine issue of material fact in dispute and she is, therefore, entitled to judgment as a matter of law.  Citing *Wilkins v. Baptist Healthcare System, Inc.*, 150 F.3d 609 (6th Cir. 1998), Defendants contend that summary judgment is not an appropriate means by which to conduct a *de novo* review of an ERISA decision and that the Court "should conduct its own independent *de novo* review of the evidence and make its own independent determination of whether the medical evidence in the administrative record before LINA showed Plaintiff to be disabled under the governing definition of her disability Plan."  (Defs.' Mem. Opp'n Pl.'s Mot. Summ. J. ("Defs.' Opp'n") at 2.)

Plaintiff responds, incorrectly, that the *Wilkins* discussion and holding regarding the inappropriateness of the use of summary judgment in ERISA cases is merely dicta.[7]  More appropriately, she notes that *Wilkins* is not binding precedent in the Tenth Circuit,[8] and that there

---

[6]  The appellate court noted that this Court "need not allow the parties to submit additional evidence, unless it determines that supplementation of the record is necessary to conduct an adequate *de novo* review. *Id.* at 637 n.6 (citing *Hall v. Unum Life Ins. Co of Am.*, 300 F.3d 1197, 1202 (10th Cir. 2002)).

[7]  In *Wilkins*, Judge Cole announced the judgment of the court and delivered an opinion in which Judges Ryan and Gilman concurred, except as to Part II. F., the section addressing the issue of Summary Judgment in ERISA cases. 150 F.3d at 616-17.  Judge Gilman delivered a separate opinion, in which Judge Ryan concurred, thus constituting the opinion of the court on that issue, finding not only that "a district court should not adjudicate an ERISA action as if it were conducting a standard bench trial under Rule 52," *id.* at 618, but that "the concept of summary judgment is inapposite to the adjudication of an ERISA action," *id.* at 619.

[8]  Indeed, having conducted its own research on this issue, the Court has found no case, published or unpublished, in which the Tenth Circuit Court of Appeals has cited, much less discussed, the *Wilkins* case as to any of its holdings. Plaintiff, however, does cite to an unpublished opinion for the District of Utah that addresses *Wilkins*:

have been many cases in this Circuit, citing *Hall v. Unum Life Insurance Company of America*, 300 F.3d 1197, 1202 (10th Cir. 2002), in which the summary judgment procedure was employed at the district court level and reviewed without comment by the appellate court.  Plaintiff also discusses an ERISA opinion from this District, *Britton v. Long Term Disability Insurance Plan of Lovelace Institutes*, No. 99-768 (D.N.M. filed Aug. 23, 2000), in which summary judgment was used to conduct a *de novo* review.

The Court agrees with Defendants that utilization of the summary judgment procedure appears inapposite to an ERISA adjudication, given that "the function of a district court at the summary-judgment state is *not* to ' weigh the evidence but to determine whether there is a genuine issue for trial.'" *See Wilkins*, 150 F.3d at 619 (emphasis added)(quoting *Anderson v. Liberty Lobby,*

---

As a preliminary matter, defendant argues that summary judgment is an improper procedure for claims arising under ERISA, relying on *Wilkins v. Baptist Healthcare System, Inc.*, 150 F.3d 609 (6th Cir. 1998); therefore defendant has made a motion for Judgment on the Administrative Record. In *Wilkins*, the court affirmed summary judgment for the defendant plan administrator and ruled that its decision to deny benefits was not arbitrary and capricious.  In the concurring opinion, two judges concluded that summary judgment was not an appropriate procedure for ERISA claims.  Summary judgment, they argued, is a procedure designed to determine whether there is a genuine issue of material fact for trial.

The issue seems to be one of semantics, and the Tenth Circuit Court of Appeals has neither adopted the analysis in *Wilkins* nor expressed concern in using summary judgment for disposition of actions arising under ERISA.  On the contrary, the Tenth Circuit seems to condone its use by continuing to affirm decisions that were rendered pursuant to motions for summary judgment in ERISA cases. *See, e.g., Hickman v. Gem Ins. Co., Inc.*, 299 F.3d 1208 (10th Cir. 2002), *Nance v. Sun Life Assurance Co. of Canada*, 294 F.3d 1263 (10thCir. 2002), *Woods v. Arco Long Term Disability Plan*, [No. 01-8009, 2002 WL 89931] (10th Cir. Jan. 24, 2002), *Wagner-Harding v. Farmland Indus. Inc.*, [No. 01-3085, 2001 WL 1564041] (10th Cir. Dec. 10, 2001).  Therefore, absent further direction from the Tenth Circuit Court of Appeals, summary judgment is an appropriate procedural method as applied to this case.

*Spencer v. Prudential Ins. Co. of Am.*, No 1:00 CV 00075 B, slip op. at 5-6 (D. Utah Apr. 8, 2003)(Benson, J.).

The Court also notes, however, a recent decision from the District of Utah which states that although the determination of whether a denial of benefits is arbitrary and capricious under ERISA "commonly arises in the context of the parties' submission of a case pursuant to summary judgment motions, . . . it is more accurately considered as an appeal from an administrative decision." *Omasta v. Choices Benefit Plan*, 352 F. Supp. 2d 1201, 1206 (2004)(Stewart, J.).

*Inc.*, 477 U.S. 242, 249 (1986)). As the Court has previously determined in this matter, a trial is unwarranted in ERISA cases in general and this case in particular. (*See* Memo. Op. and Order (Docket No. 57)(citing *Sandoval v. Aetna Life and Cas. Co.*, 967 F.2d 377, 380 (10th Cir. 1992); *Kearney v. Standard Ins. Co.*, 175, F.3d 1084, 1094-95 (9th Cir. 1999)); *see also Ingram v. Martin Marietta Long Term Disability Plan for Salaried Employees of Transferred GE Operations*, 244 F.3d 1109, 1114 (9th Cir. 2001)("there is no right to a jury trial in ERISA cases").)  Additionally, as discussed *infra*, in conducting a *de novo* review, the Court is called upon to "weigh" the evidence, whether that evidence is limited only to the administrative record or also includes supplemental materials.

Furthermore, the cases cited by Plaintiff offer little in direct support of her position on this issue.  In *Hall*, the district court denied defendant's motion for judgment on the administrative record, which it characterized as a motion for summary judgment, and following a subsequent bench trial, found for plaintiff.  300 F.3d at 1200.  The appellate court's review, however, was limited to the district court's admission of evidence outside the administrative record and awarding of attorney fees, not the decision on the merits or the procedure employed to reach it.  *See id.*  Additionally, in all of the cases cited in the *Spencer* decision in support of the proposition that the Tenth Circuit seems to condone the use of summary judgment in ERISA cases, *supra* note 8, summary judgment was granted to defendant(s), thereby fitting squarely within the reasoning of the *Wilkins* court:

> We suspect that the summary-judgment mode of analysis has been uncritically utilized time and again because district courts tend to concur with the ruling of the administrator in an ERISA action.  In such a case, no harm is done by entering summary judgment in favor of the administrator.  If, on the other hand, a district court rejects the ruling of the administrator, the district court would then have to independently weigh the evidence in the administrative record and render *de novo*

8

factual determinations.  There thus appears to be no benefit in having the district court first filter the administrator's ruling through a summary-judgment strainer.

150 F.3d at 619 (citations omitted).

The *Britton* case, too, may be seen as ultimately illustrative of the soundness of the reasoning behind *Wilkins*.  In the Memoranda Opinion and Order cited by Plaintiff, which addressed defendant's motion for summary judgment, the court began with an extensive narration of the factual background, which it specifically noted consisted of undisputed material facts.  *Britton*, No. 99-768, at 1-9 (Aug. 23, 2000).  Continuing to the standard of review, the court noted that whether applying the *de novo* or the arbitrary and capricious standard, "the *reviewing* court may consider *only the evidence that was before the administrator* at the time of its final decision."  *Id*. at 14 (emphasis added).  Finally, the court concluded its analysis by finding that the defendant had erred in its conclusions regarding plaintiff's long term disability claim and denied defendant's motion for summary judgment.  *Id*. at 18-19.  Because the court had only defendant's motion for summary judgment before it, however, the matter was not yet concluded, even though the court had reached its ultimate decision in the merits.  Instead, the court subsequently had to address a second motion for summary judgment, this time plaintiff's, and conduct another review of the exact same evidence that had been before the administrator, reach the same conclusions of law, and finally again find in favor of plaintiff.  *Britton*,  No. 99-768, slip op. (Oct. 5, 2001)(citing to its Mem. Op. and Order of Aug.23, 2000, in support of each undisputed material fact and each conclusion of law).  As the *Wilkins'* court surmised, this procedure, while causing no harm, appears to have no benefit.  150 F.3d at 619.

Regardless, the Court is inclined to agree with its sister court in the District of Utah that the issue may be "one of semantics." *Spencer v. Prudential Ins. Co. of Am.*, No 1:00 CV 00075 B, slip op. at 5 (Apr. 8, 2003). It is undisputable at this juncture that this Court is to conduct a *de novo* review of the administrative record as of the date Plaintiff filed this suit, August 25, 1999, and any other evidence it deems necessary to conduct that review, to determine whether Plaintiff was disabled under the terms of the Plan. *Gilbertson*, 150 F.3d at 637 & n.6. This, therefore, is what the Court shall do.[9]

In conducting a *de novo* review, the Court gives no deference and no presumption of correctness to the administrator's decision; rather, the Court "simply decides whether . . . it agrees with the decision under review." *Perry v. Simplicity Eng'g*, 900 F.2d 963, 966 (6th Cir. 1990) (disagreed with on other grounds by *Hall*, 300 F.3d at 1201-02 (scope of review not necessarily limited to record before administrator)); *see also Hammers v. Aetna Life Ins. Co.*, 962 F. Supp. 1402, 1406 (D. Kan. 1997). The Court interprets the terms of an ERISA plan "giving the language its common and ordinary meaning as a reasonable person in the position of the [plan] participant, not the actual participant, would have understood the words to mean." *Chiles v. Ceridian Corp.*, 95 F.3d 1505, 1511 (10th Cir. 1996)(alteration in original)(quoting *Blair v. Metro. Life Ins. Co.*, 974 F.2d 1219, 1221 (10th Cir. 1992)). The Court's role, then, is to "determine whether the administrator

_____

[9] The Court notes that the parties have had sufficient opportunity to fully develop their arguments regarding the proper resolution of any factual disputes in this matter and the legal conclusions to be drawn therefrom. Further briefing has not been requested and is unnecessary. *Cf. Rowan v. UNUM Life Ins. Co. of Am.*, 119 F.3d 433, 437 (6th Cir. 1997)(pre-*Wilkins* decision reversing grant of summary judgment; even though district court's resolution of substantial question of fact must be based solely on administrative record, remand necessary to allow parties to fully develop their arguments; district court then to determine under *de novo* standard whether factual determinations of plan administrator correct or incorrect).

properly interpreted the plan and whether the insured was entitled to benefits under the plan."

*Hoover v. Provident Life & Accident Ins. Co.*, 290 F.3d 801, 809 (6th Cir. 2002).

**Scope of Review**

Plaintiff maintains that "[a]ccording to district courts within the Tenth Circuit 'de novo'

ordinarily means that the court's review is not limited by the record." (Pl.'s M. Summ. J. Memo.

Supp. ("Pl.' s Mem. Supp.") at 8 (citing *Avery v. UNUM Provident Life Insurance Co. of America*,

No. Civ. 02-193 WPJ/LFG (D.N.M. 2002).[10]) She also claims that Chief Magistrate Judge Garcia

"ordered that Ms. Gilbertson's Social Security Administration ("SSA") determination[11] be included

in the record and considered as part of the Court's *de novo* review." (*Id.* at 2 (footnote added).)

Clearly, the former statement is incomplete, at best, and the latter is only partly true. Without first

---

[10]  The opinion referenced is correctly cited as *Avery v. UNUM Provident Corp.*, No. CIV 02-193 WPJ/LFG (D.N.M. June 11, 2002). In his Order Denying Plaintiff's Request for Limited Discovery on ERISA Claim and Staying Discovery on State Law Claims, then Magistrate Judge Garcia quoted *Reynolds v. UNUM Life Insurance Company of America*, 1998 WL 654475 at *3, No. Civ. A. 97-D-2325 (D. Colo. June 15, 1998): "'[D]e novo' ordinarily means that the court's review is not limited by the record, nor is any deference given the conclusion under review; rather, the court is to pursue the inquiry necessary to exercise its independent judgment.'" *Avery*, at *4. However, Judge Garcia then proceeded to deny the requested discovery:

> Notwithstanding the determination that UNUM failed to rebut the presumption of a *de novo* standard of review, the Court denies Avery's requested discovery for several reasons. First, Avery has not demonstrated circumstances that clearly establish additional evidence is necessary to conduct an adequate or just *de novo* review. In most cases, where additional evidence is not necessary for adequate review, the district court should only look at the evidence that was before the plan administrator.
> . . . Avery simply has not come forward with a compelling reason to warrant departure from the general rule precluding discovery outside of the administrative record.
> Policy concerns supply the second reason for the Court's denial of Avery's request. Discovery in ERISA cases is the exception rather than the rule. . . .
> The Court recognizes that under specific circumstances some courts permit limited discovery in relation to ERISA claims and also that the Tenth Circuit has yet to resolve this exact question. This case, however, does not present the Court with sufficient reason to depart from what it perceives to be the general rule. Avery simply has not provided the Court with any compelling justification for why he is entitled to more than a full review of the administrative record with respect to his ERISA claim.

*Id.* at *8-9 (quotation marks, omissions, and citations omitted). The Tenth Circuit has subsequently decided this issue. *See Hall*, 300 F.3d 1197.

[11]  The September 24, 1999, Notice of Decision of the Social Security Administration Administrative Law Judge is attached as Ex. A to Plaintiff's Motion for Summary Judgment and Memorandum in Support.

having secured the Court's permission, Plaintiff also has supplemented the record with two documents which were considered by the SSA Administrative Law Judge ("ALJ") in reaching his decision: a letter dated September 30, 1998, from Frank X. O'Sullivan, M.D., to Dr. Robinson, reporting on his rheumatology consultation, and a report dated November 24, 1998, by Leonore A. Herrera, M.D., consultive physician for the SSA. (*Id.* Exs. B and C.) Defendants object to the Court considering any of these materials.

While *de novo* review ordinarily is restricted to the administrative record, the Court may allow supplementation of the record "when circumstances *clearly establish* that additional evidence is *necessary* to conduct an adequate *de novo* review of the benefit decision."  *Hall*, 300 F.3d at 1202 (emphasis added)(quoting *Quesinberry v. Life Ins. Co. of N. Am.*, 987 F.2d 1017, 1025 (4th Cir. 1993)).  Thus, it is the "unusual case" in which supplementation should be allowed, with only "exceptional circumstances" warranting the admission of additional evidence. *Id.* at 1203.  Such circumstances might include

> claims that require consideration of complex medical questions or issues regarding the credibility of medical experts; the availability of very limited administrative review procedures with little or no evidentiary record; the necessity of evidence regarding interpretation of the terms of the plan rather than specific historical facts; instances where the payor and the administrator are the same entity and the court is concerned about impartiality; claims which would have been insurance contract claims prior to ERISA; and circumstances in which there is additional evidence that the claimant could not have presented in the administrative process.

*Id.* (quoting *Quesinberry*, 987 F.2d at 1027).

The burden of establishing why the Court should exercise its discretion to admit particular evidence lies with the party seeking to supplement the record. *Id.*  In considering such a motion, the Court must "' address why the evidence proffered was not submitted to the plan administrator,'

[*Quesinberry*, 987 F.2d at 1027], and should only admit the additional evidence if the party seeking to introduce it can demonstrate that it could not have been submitted to the plan administrator at the time the challenged decision was made." *Id.* (citing *Davidson v. Prudential Ins. Co. of Am.*, 953 F.2d 1093, 1095 (8th Cir. 1992)). Additionally, "[c]umulative or repetitive evidence, or evidence that 'is simply better evidence than the claimant mustered for the claim review' should not be admitted." *Id.* (quoting *Quesinberry*, 987 F.2d at 1027).

Plaintiff offers no argument for the admission of the reports by Drs. O'Sullivan and Herrera, merely stating that they "can be admitted in accordance with the remand remit of the Tenth Circuit if this Court determines that supplementation of the record is necessary to conduct an adequate *de novo* review." (Pl.'s Reply Mem. Supp. Summ. J. ("Pl.'s Reply") at 10.) Indeed, Plaintiff admits that these records "simply corroborate the findings of Drs. Bender and Robinson" (*id.*), and she provides no explanation of why she did not submit them to LINA for consideration, which she clearly could have done. Thus, Plaintiff has not met the requirements for supplementation set forth in *Hall*, and Exhibits B and C will not be considered by the Court.

Judge Garcia did allow Plaintiff "to supplement the record by filing a copy of the SSA's disability determination." (Scheduling Order and Order Authorizing Supplementation of the Record (Docket No. 68) at 2.) What Plaintiff fails to note, however, is that Judge Garcia further stated that

> [w]hile the Court agrees [with Defendants] that this SSA determination is not determinative of the outcome of this ERISA litigation,[12] it *may* be relevant to

---

[12]   *See, e.g., Tegtmeier v. Midwest Operating Eng'rs Pension Trust Fund*, 390 F.3d 1040, 1047 (7th Cir. 2004)(while Social Security decisions instructive, not dispositive, except in cases where plan ties benefits to Social Security decision); *Pari-Fasano v. ITT Hartford Life & Accident Ins. Co.*, 230 F.3d 415, 420 (1st Cir. 2000)(although related Social Security benefits decision might be relevant to insurer's eligibility determination, should not be given controlling weight except perhaps in rare case in which statutory criteria are identical to criteria in insurance plan.); *Elliott v. Sara Lee Corp.*, 190 F.3d 601, 607 (consideration of SSA's finding should depend in part on presentation of some

consideration as part of the Court's *de novo* review.  Moreover, *the parties are afforded an opportunity in their briefing to discuss the effects or non-effect of this SSA determination on the present ERISA case.*

(*Id.* (footnote and emphasis added).)   Again, Plaintiff has offered no discussion in her Motion and Memorandum in Support as to what effect the SSA determination might have on this matter or why the Court should consider it.

In the decision dated September 24, 1999, the ALJ found Plaintiff disabled and entitled to Social Security disability insurance benefits as of April 14, 1998.[13]  (Pl.'s Mem. Supp. Ex. A., Decision.)  Although he noted that Claimant's overall condition of " 'severe' fibromyalgia, had "not, at all times under review, met or equaled in severity any disorder described in the Listing of Impairments[14]" (*id.* at 1), he relied upon the medical records and reports of Drs. Robinson, O' Sullivan, and Herrera; a consultative psychiatric examination performed by Paula Hughson, M.D., on March 22, 1999; a report by Al S. Fedoravicius, Ph.D., who treated Plaintiff for "symptoms of pain, anxiety, depression, fatigue and cognitive difficulties, namely concentration"; and Mrs Gilbertson's testimony in reaching his final decision (*see id.* at 2-3).

---

evidence "disability" definitions of agency and Plan are similar; not case here, so could be considered as evidence, but not determinative); *Whatley v. CNA Ins. Cos.*, 189 F.3d 1310, 1314 (11th Cir. 1999)(holding benefits eligibility determinations by SSA are not binding on disability insurers; criteria for determining eligibility substantively different than criteria established by many insurance plans; however district court may consider SSA determination).

[13]  Plaintiff applied for SSA disability benefits on May 12, 1998.  (Pl.' s Mem. Supp. Ex. A, Decision at 4.)  She appealed the initial denial and received an adverse reconsidered determination, from which she then requested a hearing. (*Id.* at 1.)  A full evidentiary hearing on the merits was held by the ALJ on August 12, 1999.  (*Id.*)

[14]  The ALJ also considered a State Agency medical consultant' s opinion that Mrs. Gilbertson was "capable of light type work activities," finding that "[w]hile this opinion may have been reasonable at the time, *additional evidence received into the record at the hearing level* convinces the undersigned that the claimant is more limited than was originally determined."  (*Id.* at 3-4 (emphasis added).)

Plaintiff agrees with Defendants, as does the Court, *see supra* note 11, that disability determinations of the SSA are not dispositive of ERISA plan issues. (Pl.'s Reply at 11.)  She makes no argument, however, as to how the SSA decision may be relevant to the *de novo* review of her ERISA claim or even what effect it should have in this regard, much less that the decision meets the supplementation requirements set forth in *Hall*.  Rather, she argues that Defendants should have compared Social Security procedures with their plan and that the Court should attach some significance to the fact that Defendants requested that Plaintiff provide a copy of any Social Security award or denial letter.[15]

Plaintiff, as the proponent of this evidence, has failed to meet her burden, even as leniently set forth by Judge Garcia, and the Court will not consider the SSA Decision.  While the Decision itself certainly has some relevance to the determination to be made by this Court, its usefulness is strongly undercut by the ALJ's extensive reliance upon medical reports and records which Plaintiff did not provide to LINA or the Court, those of Drs. Hughson and Fedoravicius, and the reports and records of Drs. O'Sullivan and Herrera, which also are not part of the administrative record and which the Court has concluded may not be considered.  Furthermore, the ALJ was obligated to give deference to the only other medical evidence supporting the Decision, Dr. Robinson's opinions as "treating physician," but neither LINA nor the Court are required to do so.  *See Black & Decker*

---

[15]  Pursuant to the Administrative Services Agreement/Claim Consulting Agreement (App. Rec. at 195-210) between AlliedSignal and The Benefits Committee Designated as the Administrator of the Association's Long Term Disability Income Benefit Plan and LINA (*id*. at 195), where LINA determined that a claimant might qualify for Social Security disability benefits, it was to so notify the claimant and provide general information about filing for benefits and how to prosecute appeals if benefits were denied (*id*. at 205).  By letter to Plaintiff dated October 23, 1998, the Case Manager requested that Plaintiff send a copy of the Social Security Award/Denial letter as soon as it was received.  (*Id*. at 247.)  In a subsequent letter dated November 12, 1998, a Case Manager again requested that Plaintiff inform LINA of the status of her Social Security application.  (*Id*. at 257.)  Although Mr. Gilbertson apparently informed LINA in a phone conversation on November 17, 1998, that his wife had been denied benefits and that he would send a copy (*id*. at 258), he apparently never did so, as there is no such document included in the record.

*Disability Plan v. Nord*, 538 U.S. 822, 825, 834 (2003)(under rule adopted by Commissioner, special weight accorded opinions of claimant's treating physician; courts, however, have no warrant to require ERISA plan administrators to accord special deference or weight to opinions of claimant's physician, nor to impose discrete burden of explanation on plan administrators when they credit reliable evidence that conflicts with treating physician's evaluation).  Thus, the Court's *de novo* review is limited to the administrative record before LINA at the time Plaintiff filed suit.

**The Plan**

AlliedSignal's Plan defines "disability" as

any physical or mental condition which, in the judgement of the Plan Administrator, based on evidence satisfactory to the Plan Administrator--
(a) will prevent the Member from engaging in his normal occupation or a substantially comparable occupation; and
(b) will prevent the Member, after he has been disabled for two years, from performing any occupation for which he is suited by training and education.

(App. Rec. (Plan § 2.10) at 108.)  Plaintiff contends that the because the language in The Summary Plan Description[16] ("SPD"), (*id*. at 215-221), differs, it controls.  *Semtner v. Group Health Servs. of Okla.*, 129 F.3d 1390, 1393 (10th Cir. 1997)("When the summary plan description and the plan language differ, the summary plan description is binding.").

The meaning of disability is discussed in two sections of the SPD.  On the first page of the pamphlet is a box labeled "What does the plan consider disabled?":

You are considered disabled if you provide medical evidence satisfactory to the Company that you are:

---

[16] "A summary [plan description] must be ' written in a manner calculated to be understood by the average plan participant, and shall be sufficiently accurate and comprehensive to reasonably apprise such participants and beneficiaries of their rights and obligations under the plan.'" *Semtner v. Group Health Servs. of Okla.*, 129 F.3d 1390, 1393 (10th Cir. 1997)(alteration in original)(quoting *Williams v. Midwest Operating Eng'rs Welfare Fund,* 125 F.3d 1138, 1140 (7th Cir. 1997)(quoting 29 U.S.C. § 1022(2)(1))).

> – unable to engage in your normal occupation (or a comparable occupation); and
> – after two years of disability, you are unable to engage in any occupation for which you are trained and educated.
> You may be asked to submit proof of your continuing disability from time to time.

(*Id.* at 216.)  The section titled "Long Term Disability Benefits" provides:

> Qualification for Long Term Disability depends upon the severity of your condition:
> • For the two years immediately following your last day worked, you must be unable to perform the duties of your normal job or substantially similar duties.
> • After the initial two years, you must be unable to perform the duties of any job for which you are qualified by education, training, or experience.

(*Id.* at 219.)  It is the latter provision that Plaintiff maintains must be applied in her case: the " 'normal 'job' ' " standard, as opposed to "normal 'occupation.' "

The Court agrees with Defendants that language in the Plan and the SPD is substantially similar.  (Defs.' Opp' n at 4 n.1.)  Without commenting on what the differences may be between "job" and "occupation," the Court adopts the "job" standard, with which Defendants apparently also concur, (*see id.* ("The issue before the Court, as it was before LINA, is whether Plaintiff could perform her job or another job with similar duties.").  Thus, the Court must decide whether Plaintiff provided medical evidence satisfactory to show that she was unable to perform the duties of her normal job or substantially similar duties.

**The Record**

Plaintiff applied for LTD benefits on October 6, 1998, listing fibromyalgia as the cause of her disability.  (App. Rec. at 224).  She described her job as "perform administrative assignments with policies + procedure, budgets appropriations + expenditures.  Create reports, compile data + analyze results," and attached three versions of formal job descriptions that had been used for her position over the preceding three years.  (*Id.*)  Plaintiff further explained that

my job required a great deal of detail and a high degree of decision-making skill. The concentration difficulties associated with Fibromyalgia have made it difficult for me to concentrate on simple tasks for long periods of time. Simple tasks have been anything from reading a book to sorting laundry.

In my job it was quite common for me to have to deal with several problems/ questions concurrently and with converging deadlines. Again, the concentration difficulties associates [sic] with Fibromyalgia make it impossible to process information from too many sources. Rather than process information and make decisions, it is now necessary for me to deal with things one at a time, usually over a course of several days in order to reduce the stress and pain levels. This would be completely unacceptable in the job I held.

In order to meet deadlines and project requirements if [sic] was often necessary for me to work for several hours without stopping. The physical limitations of Fibromyalgia make it impossible for me to do anything that requires sitting, standing or moving in the same position for any long period of time. Simple things such as sitting in a car or chair for longer than 30 minutes causes pain, muscle spasm, and/or tingling in the legs.

Sleep disturbance problems make it impossible for me to maintain any type of schedule. It is quite common for me to need to sleep for as much as four hours during the day.

These are the main obstacles I believe exist that would keep me from doing my former job. In addition, severe intolerance to commonly prescribe [sic] medications have caused problems such as nausea, vomiting, and inability to stay awake.

(*Id.* at 225.)

In his Work Statement dated October 7, 1998, Plaintiff's immediate supervisor explained her

job duties as:

Support FM&T/NM, LTS in 3 main areas: 1) Training logistics for EIT, J/A & QTS in preparation, distribution & collection of data & reports, TSD budget tracking & reconciliation, 2) Depart. Admin of expense budget develop. & maint, Direct vs Indirect labor % tracking, contract perform, monitoring plus, 3) Facilities & spec Proj - support of.

(*Id.* at 243.) He also stated that Plaintiff spent 80% of her time sitting, 5% standing, and 15%

walking; that she was required to meet deadlines involving "3-5 Reports routinely plus 1-2 projects

support req." per month; and that her job involved emotional stress, rating it at "6" on a scale of "(mild) 1" to "(severe) 7."  (*Id.*)

By letter on October 23, 1998, LINA acknowledged receiving Plaintiff's LTD application and informed her that they needed additional medical information from Dr. Robinson and Dr. Bender for the period of "March 1998 through the present," which had been requested.  (*Id.* at 247.) Subsequently, LINA received the following medical documentation:

1.  Dr. Robinson's "To Whom It May Concern:" letter, dated August 14, 1998, in which she stated that Plaintiff's problems included "sleep disturbance, difficulty focusing and concentrating, loss of fine motor coordination and muscle and soft tissue pain, primarily in the neck, shoulders and arms."  (*Id.* at 239.)  Dr. Robinson also commented that Plaintiff's

> progress has been a slow but steady improvement but good and bad days are still intermingled.  When she is fatigued and unable to sleep, her symptoms get worse.  She is extremely intolerant of medications, including both tricyclic anti-depressants and SSRIs.  She participates in both tai chi and water aerobics, which help her symptoms and her sleep.  Although she is improving, we cannot yet predict when she will be able to return to work due to the unpredictable nature of her disease.  When she does return to work, I am anticipate [sic] that she will need to start with part-time employment.

(*Id.*)

2.  Medical Release Form Long-Term Disability, completed by Dr. Robinson on October 7, 1998, in which she indicated that Plaintiff's physical limitations were "fatigue, mialgias, trigger points, problems concentrating, insomnia," that Plaintiff was unable to perform her job because she was "unable to cope with stress, deadlines, and prolonged sitting/working," that Plaintiff may return to her job with a modification of "part-time

19

employment," that she could not perform a sedentary job with mild stress because "prolonged sitting is difficult," and that expected length of Plaintiff's disability was "unknown." (*Id.* at 241.)

3.  a questionnaire completed by Dr. Robinson on November 2, 1998, in which she indicated "mild sleep improvement with herbs and Parafton DSC[, i]ntolerance of tricyclic antidepressants & SSRIs," trigger points on "L shoulder, low back, calves, feet, forearms & upper arms," that "sleep helps fatigue and pain[, o]nly once a week gets a full good night's sleep," that a series of tests had been run, all of which were normal, that no psychiatric evaluation had been completed, that Plaintiff experienced "50% weakness in forearms/hands after repetitive movement[, r]esolves after 30 minutes rest," and that the only abnormalities on clinical examination were the trigger points. (*Id.* at 252-53.)

4.  Dr. Robinson's treatment records from March 12 through September 11, 1998:

> 03/12/98 . . . 35-year-old female with numerous complaints. She and her husband relate at least 15 months of soft tissue tenderness with palpation, massage and chiropractic manipulation. No red, hot or swollen joints. Concerned she may have fibromyalgia since her mother had it. Pain is even bad a night, awakening her . . . Does not sleep well . . . She has not had a physical in a long time . . . Probable fibromyalgia . . . Complete physical to be scheduled, including lab work.

> 03/24/98. . . in for physical . . . Never sleeps well and frequently awakens during the night . . . does not go back to sleep well . . . feels she awakens and thinks about everything that is going on during the day . . . Approximately 15 months ago, started noticing sore spots, including sore to touch. There are no red, hot or swollen joints. Although they are sore to touch, massage helps. . . . No acutely inflamed joints. . . . Most of her tender spots today are in the trapezius muscles and along the costochondral margins and along the lower ribs. . . . I suspect she does have fibromyalgia. . . . Not clearly sleep apneic. Early morning wakening is a symptom of depression. We will begin workup. . . .

20

3/30/98 . . . [tests] all normal or - . . . counseled re: rest, diet, exercise . . . .

PC 4/17/98  No longer AM groggy  Sleeping better . . . .

PC 4/23/98  Too sedated . . . .[adjusted medication dosage]

PC 4/24/98  more alert today

05/08/98 . . . in for follow-up of fibromyalgia. . . . Oriented completely today.
. . . Discussed diet, herbal supplements, exercise, relaxation, yoga or Tai Chi,
remaining off work until things are going better, etc.  She is hesitant to try
anything that will sedate her, so she will try Zoloft, 25 mg daily for a week,
and then 50 mg daily for a week.  Reevaluate in two weeks or p.r.n. problems.

PC 5/11/98 . . . tolerable nausea . . . .

PC 5/15/98  Still . . . quezy esp if hot.  Still some fatigue every 3-4 hrs.  Earlier
in the week, + muscle pain but now doing fine . . . Rec: ahead : [raise] Zoloft
to 50 . . . .

PC 5/18/98  Still nauseated . . . but . . . tolerated Zoloft at 50 . . . .

PC 5/26/98  Not dramatically better but [not] worse  We will try to push dose.
Zoloft 100 . . . .

PC 5/29/98  Overall side effects are worse than benefits  Not resting well,
Twitchy  [increased] nausea . . . Work on exercise, etc.  . . . .

06/17/98 . . . In for follow-up of fibromyalgia.  Does water aerobics twice a
week as well as Tai Chi twice a week.  Her husband is learning massage
therapy, which is very painful.    The next day, she feels slightly
uncomfortable, but by 48 hours feels better.  Her biggest problem is sleep
disturbance.  Neither tricyclic antidepressants nor SSRIs have helped.  She
has taken no drugs for several weeks and has finally cleared out her system.
. . . She feels life would be much better if she could sleep.  All the nausea has
resolved.  Unable to go back to work  Shoulders bother her more than
anywhere else, but other areas do hurt.  Restless legs at night. . . . No acutely
inflamed joints.  Alert and oriented.  No other exam. . . . Will work on sleep
problems. . . . She will continue above regimen, and work excuse is given for
the next three months while we get things under control.  She will . . . call
with follow-up in one week.

Case 1:99-cv-01065-LH-LFG   Document 84   Filed 06/30/05   Page 22 of 30

07/14/98 . . . Feels she is doing better with her fibromyalgia. Sleeps three out of four nights. Gets tired by 6:00 p.m., but doing more during the day. Back taking her vitamins. Less pain. She came in with her daughter and just wanted to let me know that she was feeling some improvement.

08/14/98 . . . Patient is able to sleep well 50% of the time, but other time, she thrashes most of the night. After those nights, she has difficulty focusing and concentrating with increasing pain in her neck and shoulders and poor fine motor coordination. A chiropractor has finally gotten her headaches under control. . . . She continues in tai chi and water aerobics. The water aerobics are especially effective if she can do them at night. . . . No other exam. . . . Continue above regimen. Letter written for employer. . . .

9/11/98 PC  Parafon . . . helps . . . muscles.

(*Id*. at 264-67.)

5.  Dr. Bender's letter to the State of New Mexico Disability Determination Services, dated July 30, 1998, in which he stated that Plaintiff's symptoms were consistent with a diagnosis of fibromyalgia and that she "suffers from frequent tension headahces [sic], and intermittent, recurrent muscle and joint pain . . . exhibits persistent taut and tender fibers," and had trigger points in "the sub-occipital muscles, the levator scapulae, the upper trapezius and the rhombiods [sic] minor and major." (*Id*. at 260.)

6.  Dr. Bender's treatment notes. (*Id*. at 261-62.)

After reviewing Plaintiff's claim file with the assistance of its medical consultant, LINA concluded in its denial letter to Plaintiff, dated December 9, 1998, that while the medical documentation did indicate some symptoms of the diagnosis of fibromyalgia, such as headaches, difficulty sleeping, pain, tenderness and weakness of some joints and muscles, it did not provide a clear understanding of how the condition would cause impairment to her functional level or that these symptoms would render her totally disabled. (*Id*. at 275-76.) LINA specifically noted that the

22

records indicated that Plaintiff had been experiencing symptoms for about fifteen months before she stopped working; her physical exam was within normal limits; she did not have red, hot or swollen joints; there was no indication of what changed as of March 12, 1998, to render her totally disabled, as determined by Dr. Robinson; and Dr. Robinson's and Dr. Bender's list of trigger points were not consistent with each other. (*Id.* at 276.) LINA also observed that the medical office notes indicated Plaintiff experienced some changes and difficulty with medication; had good response to therapy, tai chi and water aerobics; that her chiropractor had gotten her headaches under control; and that Plaintiff was feeling better and sleeping better in July and August. (*Id.*) Finally, LINA concluded that the office notes and test results did not address or provide supportive documentation of Plaintiff's inability to perform her occupation; there was no indication of Plaintiff's abilities, restrictions, and limitations and how her condition affected her ability to work; the treating providers had not addressed Plaintiff's functional capacity and their records did not provide that she was incapacitated to the degree that she would be prevented from performing her occupation. (*Id.*) LINA informed Plaintiff that for reconsideration of her claim she should submit medical evidence, including, but not limited to office notes; test results with positive findings precluding her return to work; an outline or picture of existing trigger points; narrative reports outlining her abilities, restrictions, and limitations, along with medical evidence to support the narrative; results from functional capacity evaluations; therapy notes and reports; rehabilitation records and reports; treatment summaries and plans; examples of how her activities of daily living were restricted or impaired; and other medical evidence, such as records of a rheumatologist, if she had consulted one as Dr. Robinson had recommended she do in August 1998. (*Id.*)

Plaintiff appealed and submitted the following additional material in support of her claim.

1.  Dr. Bender's medical report dated February 25, 1999, in which he offered the medical diagnosis of "fibromyalgia; chronic segmental dysfunction of the lumbar and cervical spine, with reversal of the cervical lordosis noted at C3, C4, C5 + C6. Degenerative spondylosis of the thoracic spine," and described Plaintiff's physical limitations:

    > repetitive motion of any kind for longer than 15 minutes exacerbates existing pain in the neck, upper back, both shoulders, lower back, and legs. Even mild stress induces muscle spasm and frequent unremitting headaches for weeks at a time. Reduced grip strength, compromised coordination and frequent unsteady gait. . . . Mrs. Gilbertson is also unable to sit or walk for any length of time without pain. Patient is also predisposed to undue fatigue and requires daily naps.

    (*Id.* at 299-300.) He further stated that Plaintiff could not return to work in a modified capacity because she was "unable to perform any task requiring sitting, standing or concentrating for more than 15 minutes at a time," and that "[s]tress caused by the nature of the job and by deadline requirements aggravate all of her symptoms and cause unmanageable pain." (*Id.* at 299.) Finally, he concluded that Plaintiff also could not perform a sedentary job with mild stress because "mild stress alone will not alter the sedentary nature of the work described, with all of the attending physical limitations described above." (*Id.*)

2.  Affidavits from Plaintiff's husband, a friend, and a former supervisor and friend made in connection with her claim for Social Security Disability benefits. (*Id.* at 301-05.)

3.  Dr. Robinson's letter of March 29, 1999, to Plaintiff's attorney, in which she addressed "the question of how the diagnosis of fibromyalgia would affect [Plaintiff's] ability to return to her normal work as an administrative support coordinator," for which she used a copy of Plaintiff's job description. (*Id.* at 307-08.) Dr. Robinson stated that

24

fibromyalgia caused Plaintiff "to have severe headaches, sleep disturbance and difficulty concentrating," which "along with overwhelming fatigue," made her unable "to compile and analyze data, track and report on projects, coordinate activities with other organizations and compile, develop, coordinate, monitor and maintain financial and budgeting reports." (*Id.* at 307.) Dr. Robinson also maintained that Plaintiff's "inability to concentrate and function at a level to which she was accustomed poses risk to the health and safety of both Louise and her coworkers, for fear that she will make improper decisions." (*Id.*) Dr. Robinson further wrote that

> Her muscles become very sore when left in any one position for a prolonged period of time. Sitting at a desk would make that worse. At the same time, repetitive activity will make her muscles hurt. Again, sitting at a desk, and at a computer, will worsen her problems. Therefore, she is unable to sit and perform for any particular period of time. Because of the nature of her disease, we are unable to predict the amount of time that she could work in this position For example, one day, fibromyalgia may bother her after sitting for ten minutes at her computer, and another day, only after a longer period of time.

(*Id.* at 307-08.) Finally, Dr. Robinson observed, "stress will only worsen her symptoms [and b]eing forced to meet deadlines and work in a job that requires attention to detail will only worsen her stress." (*Id.* at 308.) According to Dr. Robinson, "stress, in and of itself, worsens fibromyalgia," and she noted that Plaintiff was intolerant of antianxiety and antidepressant medications, due to "overwhelming side effects, including both sleep disturbance and overwhelming sedation." (*Id.*) Dr. Robinson concluded that she could not recommend that Plaintiff return to either part-time or full-time employment "doing the work as described in her job description." (*Id.*) Additionally, she did not "anticipate

a dramatic improvement in the near future," though she hoped "for slow but steady improvement over a very long period of time." (*Id.*)

4. Dr. Robinson's treatment records from December 18, 1998, through March 5, 1999:

> 12/18/98 . . . came in to discuss her fibromyalgia. The Parafon no longer helps her muscle pain. She thinks it makes her feel dizzy. This is less of a balance problem, but more a problem with her eyes. She may be sitting and suddenly the room will start to spin. She is not sleeping as well as she has and is considering going back to passion flower pills. She has multiple pressure points that vary. Of more concern to her is problems with her hands. She has always had pain in her hands but now she has noted some weakness, especially in her left hand. She has had trouble doing buckles in the car and taking lids off jars. Several years ago she say an occupational therapist for problems in the hands and forearms and would like to have a follow-up evaluation to see what changes have occurred. She is still seeing her chiropractor and practicing Tai Chi. . . . No significant exam done today. . . .Fibromyalgia. I agree with all of the points that this patient is making. Side effects to medicine. . . . She will bring me in a chart of her pressure points. We will arrange occupational therapy with reevaluation of hands as well as shoulders. I gave her Norflex (instead of Parafon) that she may use . . . or her passion flower pills. Any further evaluation will take place after the stress of the holidays. We will stay in close touch on how she is doing.
>
> 01/06/99 . . . complaining of head congestion . . . .Call with follow-up in next few days . . . .
>
> PC 1/11/99 Nyquil helps sleep & so she plans to try Benedryl.
>
> 03/05/99 . . . Not sleeping. Has tried Nyquil, Benadryl, passion flower pills and Norflex. Refuses antidepressants and does not think she needs them. When she does not sleep she cannot concentrate or focus and her trigger points and muscle pains are worse. . . . Obviously tired. No other exam today. . . . Insomnia causing worsening of fibromyalgia. . . . Ambien, 10 mg. I gave her ten pills, but she is not to take all of them. She will try it for a few nights and see if she cannot get back into a better sleep cycle. I have asked her to see Dr. Farrell, rheumatologist, in consultation, as well.

(*Id.* at 309-10.)

A case manager completed the Appeal Review on May 7, 1999, noting that Plaintiff had fibromyalgia, "with symptoms of headaches, fatigue, sleep disturbance and difficulty concentrating," that her trigger points as identified by her primary physician and her chiropractor "were not consistent and varied in location," and that her initial claim "was denied because we did not have medical documentation to support an inability to perform her occupation, nor were we provided with physical limitations and restrictions which would preclude work."  (*Id.* at 311.)  The case manager described the statements provided by Plaintiff's physician, chiropractor, husband, supervisor, and friend as "the author's observations regarding Ms. Gilbertson's [sic] symptoms and the changes in her condition, which render her unable to work."  (*Id.*)  She also discussed Dr. Bender's diagnosis and limitations and Dr. Robinson's opinion and recommendation that Plaintiff not return to work.  (*Id.*)  finally, the case manager concluded that the file should be referred to a registered nurse for review and referral to Dr. Franz.  (*Id.*)

Thomas Franz, M.D., reviewed Plaintiff's file on May 25, 1999, to determine, as requested by LINA, whether the descriptions provided by Plaintiff's physicians were reasonable and whether the physical and cognitive limitations and restrictions were appropriate.  (*Id.* at 312-12, 316-17.)  He found that Plaintiff clearly met the criteria for a diagnosis of fibromyalgia.  (*Id.* at 316.)  Noting, however, that patients so diagnosed should typically maintain a moderate level of physical activity and be capable of light to sedentary duties, Dr. Franz found the restrictions placed on Plaintiff, particularly those of her chiropractor, Dr. Bender, "really implausible, not only for fibromyalgia but for independent living in the community.  Such a description would be more characteristic of a person being cared for in a nursing facility."  (*Id.*)  Dr. Franz also commented that there was no indication from Dr. Robinson that Plaintiff had a particularly unusual course of fibromyalgia beyond

27

the fact that she could not tolerate many medications usually prescribed to improve sleep. (*Id.*) Therefore, Dr. Franz found, "based on the documentation of fibromyalgia alone it is reasonable to expect that the patient would be limited to light to sedentary duties and that she would benefit from a routine exercise program." (*Id.*) He concluded his report by stating that he would reassess his opinion of Plaintiff's documented work capacity if additional medical information, such as undiagnosed severe collagen vascular disease or significant psychiatric problems such as major depression with somato form feature, were to come to light. (*Id.* at 317.)

The final documentation in the record consists of a memo dated June 15, 1999, from the case manager to the registered nurse noting the agreement at the staffing session held June 10 that an "ARCON IME/FCE should be scheduled" for Plaintiff, that Plaintiff's attorney should be notified of the details of the appointment and Plaintiff copied. (*Id.* at 321.) After initially sending the file to HealthSouth for scheduling on June 29, 1999, with follow-up inquiries on July 7, July 14, July 23, and, perhaps, August 2 (*id.* at 324), on August 17 HealthSouth finally scheduled Plaintiff's appointment for September 9 (*id.* at 326). On August 25, 1999, however, Plaintiff filed suit, thereby closing the record closing the record to her claim.

**Discussion**

It is undisputed that Plaintiff suffers from fibromyalgia. Proving the disease, however, is difficult, thereby presenting "a conundrum for insurers and courts evaluating disability claims" based on fibromyalgia. *Welch v. UNUM Life Ins. Co. of Am.*, 382 F.3d 1078, 1087 (10th Cir. 2004) (quoting

*Walker v. Am. Home Shield Long Term Disability Plan*, 180 F.3d 1065, 1067 (9th Cir. 1999)).[17]

Furthermore,

> it is difficult to determine the severity of [a claimant's] condition because of the unavailability of objective clinical tests. Some people may have such a severe case of fibromyalgia as to be totally disabled from working, Michael Doherty & Adrian Jones, "Fibromyalgia Syndrome (ABC of Rheumatology)," 310 *British Med. J.* 386 (1995); *Preston v. Secretary of Health & Human Services*, 854 F.2d 815, 818 (6th Cir. 1988) (per curiam), but most do not and the question is whether [the claimant] is one of the minority.

*Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996), *quoted in Walker*, 180 F.3d at 1067.

Having reviewed the record in this matter *de novo*, and with an acute awareness of the difficulties presented by this disease, the Court finds that Plaintiff has not met her burden of providing medical evidence showing that she was unable to perform the duties of her normal job or

---

[17]  The *Welch* court further delineates this "conundrum":

*Compare* [*Walker v. Am. Home Shield Long Term Disability Plan*, 180 F.3d 1065, 1067 (9th Cir. 1999)], (holding that "no objective test exists" for proving fibromyalgia); *Jordan v. Northrop Grumman Corp. Welfare Benefit Plan*, 370 F.3d 869, 872 (9th Cir. 2004)("[F]ibromyalgia's cause or causes are unknown, there is no cure, and, of greatest importance to disability law, its symptoms are entirely subjective."); *Green-Younger v. Barnhart*, 335 F.3d 99, 108 (2d Cir. 2003)("[A] growing number of courts, including our own, . . . have recognized that fibromyalgia is a disabling impairment and that 'there are no objective tests which can conclusively confirm the disease.'")(quoting *Preston v. Sec. of Health and Human Servs.*, 854 F.2d 815, 818 (6th Cir. 1988)); *Hawkins v. First Union Corp. Long-Term Disability Plan*, 326 F.3d 914, 919 (7th Cir. 2003)(noting that fibromyalgia "itself can be diagnosed more or less objectively by the 18-point test . . ., but the amount of pain and fatigue that a particular case of it produces cannot be"); and *McPhaul v. Bd. of Comm'rs of Madison County*, 226 F.3d 558, 562 (7th Cir. 2000)(holding that fibromyalgia's "cause is unknown, there is no cure, and the symptoms are entirely subjective"); *with Boardman v. Prudential Ins. Co. of Am.*, 337 F.3d 9, 16 n.5 (1st Cir. 2003)("While the diagnoses of chronic fatigue syndrome and fibromyalgia may not lend themselves to objective clinical findings, the physical limitations imposed by the symptoms of such illnesses do lend themselves to objective analysis."); *Brosnahan v. Barnhart*, 336 F.3d 671, 678 (8th Cir. 2003)(noting that Social Security claimant's testimony and reports to the Social Security Administration were "supported by objective medical evidence of fibromyalgia"); and *Russell v. UNUM Life Ins. Co. of Am.*, 40 F. Supp. 2d 747, 751 (D.S.C. 1999)(considering a nearly identical self-reported symptoms limitation and holding that fibromyalgia is an objectively diagnosable condition).

*Welch v. Unum Life Ins. Co. of Am.*, 382 F.3d 1078, 1087 (10th Cir. 2004); *see also Gilbertson*, 328 F.3d 627 n.1(citing *Harrison's Principles of Internal Medicine* 1706-07 (Kurt J. Isselbacher *et al.* eds. 13th ed. 1994) ("Since fibromyalgia only manifests itself through clinical symptoms, there are no laboratory tests that can confirm the diagnosis.").

substantially similar duties.  She has offered no objective evidence whatsoever.  Particularly noticeable by its absence is any comprehensive analysis of Plaintiff's functional abilities; rather, Plaintiff's doctors offer only conclusory statements regarding her possibility of working.  While Dr. Robinson reported improvement, albeit "slow but steady," in August 1998, and in the late summer and fall of 1998 mentioned the possibility of eventual part-time employment, in her letter of March 29, 1999, to Plaintiff's counsel she concluded that Plaintiff could not return to her job, either part-time or full-time.  In the intervening months, between mid-August 1998 and March 1999, however, she apparently saw Plaintiff only three times and her notes of these appointments do little more than record Plaintiff's self-reported, subjective symptoms.  Thus, the Court cannot say that Plaintiff has shown by satisfactory medical evidence that she is one of the minority of fibromyalgia patients who is disabled from working at her job.  Therefore, Ms. Gilbertson's claim of eligibility for LTD benefits under the Plan based on the record before LINA at the time she filed suit must be denied.

**IT IS HEREBY ORDERED** that Plaintiff's Motion for Summary Judgment is **DENIED**.

**IT IS FURTHER ORDERED** that Defendants' administrative decision, which by operation of law is deemed as denying benefits, is **AFFIRMED**.

**IT IS FURTHER ORDERED** that this action is **DISMISSED**.

_____

**SENIOR UNITED STATES DISTRICT JUDGE**